FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

99 SEP 30 AM ０:5０
U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| SUSAN ASCHTON, | ) |
| Plaintiff, | ) |
| v. | ) CASE NO. CV 96-B-2669-S |
| AMERICAN BILLING AND COLLECTIONS, INC., et al., | ) |
| Defendants. | ) |

ENTERED

SEP 3 0 1999

## MEMORANDUM OPINION

This matter comes before the court on American Billing and Collection, Inc.'s ("ABC") Motion for Summary Judgment. The court heard oral arguments from the parties on April 8, 1998.[1] Upon the consideration of the record, the submissions of the parties, the argument of counsel, and the relevant law, the court finds that the Motion for Summary Judgment is due to be granted.

### I. FACTUAL SUMMARY

Plaintiff's most recently amended complaint asserts three different counts against ABC: Count I alleges tort of outrage, Count II alleges violations of the Fair Debt Collection Practices Act ("FDCPA") or (the "Act"), and Count III alleges civil conspiracy. In sum, Plaintiff maintains that: 1) ABC caused her to suffer severe mental anguish and emotional distress due to its handling of bills relating to adult telephone services accessed from her home; 2) ABC caused adult

---

[1] The court orally informed the parties after oral argument that summary judgment would be granted in favor of ABC.

78

magazines to be sent to her home which caused her emotional pain; 3) ABC's billing practices violated the FDCPA; and 4) ABC conspired with Defendant Allstate Communications, Inc. ("ACI") to cause these alleged injuries to her.[2]

ACI d/b/a Interactive Audiotext Services of North America ("IAS"), provides nationwide access to adult telephone services. (Shapiro Aff. ¶ 4). ABC is an affiliate corporation of ACI. (Id. ¶ 8). ABC and ACI share common ownership, as the stockholders of ABC are identical to those of ACI. (Id. ¶ 6). ABC and ACI are also commonly controlled, as the members of the board of directors are identical. (Id. ¶ 7). ABC principally deals in the business of billing and provides billing and related billing services exclusively for ACI d/b/a IAS. (McGillewie Aff. ¶ 4).

ABC does, at times, provide incidental collection services for ACI. (Id. ¶ 6). However, any debt collection activities that it performs are incidental to the primary business purpose of billing. (Id.). Moreover, the actual collection work performed by ABC on any particular account is extremely limited. (Id.). Accounts that become seriously delinquent are routinely handled by a third party bill collector, who is entirely independent from ABC. (Id. ¶ 7).

During two different time periods and under two different customer numbers and names, plaintiff received invoices from ABC for the access of adult telephone services from someone in her home. (Id. at ¶¶ 8-9). A set of three invoices relating to customer number 590005110 were billed to plaintiff in 1994, under the name Susan Hipp. (McGillewie Aff. ¶ 8; Def. Exh. 1). The invoices from 1994, totaled $846.45. (Id.). A set of four invoices relating to customer number 8950400019 were billed to plaintiff in 1995, under the name of Susan Story Aschton. (Id. ¶ 9;

---

[2] Plaintiff also asserted civil conspiracy against defendant Russel Leventhal. Defendant Leventhal filed a Motion to Dismiss on December 8, 1997, and this court granted that unopposed Motion on September 30, 1998.

Def. Exh. 2). These invoices totaled $5,222.25. (*Id.*). At the onset of each of these time periods, plaintiff was not in default on her account. (*Id.* ¶¶ 8-9).

The first set of invoices relating to customer number 590005110 were all forgiven by ABC when plaintiff explained that her son had been the one making the telephone calls. (*Id.* ¶ 8; Def. Exh. 1). Additionally, at plaintiff's request, a block was placed on plaintiff's residence telephone number to prevent any further access to the adult telephone services from plaintiff's residence. (*Id.*). Plaintiff testified that her telephone was disconnected before she received her first invoice. (Pl.'s Dep. at 37). In 1995, plaintiff obtained a new account with ABC with a telephone number different from her first account. (McGillewie Aff. ¶ 9; Def. Exh. 1). According to ABC's records, plaintiff never notified ABC that she wanted to have a block placed on this number. (*Id.* ¶ 9.). Plaintiff accumulated new charges for the accessing of adult telephone services from her home in 1995. (*Id.* ¶ 9; Def. Exh. 2).

Plaintiff maintains that on one occasion in 1995, she was contacted by a male representative from ABC. (Pl.'s Dep. at 45-46). Plaintiff does not remember the name of the person who contacted her from ABC. (*Id.* at 45). Plaintiff does recall, however, that she was told that she "had stolen from his company and that [she] was going to jail [and] that [she] would pay the bills." (*Id.* at 46). All other telephone conversations that plaintiff had with representatives of ABC were initiated by her. (*Id.* at 44-45, 93-96).[3] Plaintiff can only recollect two significantly upsetting telephone conversations. One conversation was initiated by plaintiff in 1994, but plaintiff testified that she did not find this call not threatening. (*Id.* at 89). The other

---

[3] Plaintiff did state during her deposition that there were times when ABC called her and she did not answer the phone. (*Id.* at 82). She particularly remembered one early morning telephone call, but could not remember what time it took place. (*Id.*).

was initiated by ABC and is the purported reason why plaintiff decided to see Dr. Shealy for psychiatric treatment. (*Id.* at 65). Plaintiff cannot recall who contacted her from ABC, although she is able to remember others that she spoke with from the company. (*Id.* at 45, 93-95).

Plaintiff also received three adult oriented magazines in the mail. (*Id.* at 51). Plaintiff only really looked at one of these three publications. (Pl.'s Dep. at 52, 57, 58, 60). ABC has stated that it was not responsible for the production or distribution of any of these magazines. (McGillewie Aff. ¶ 5). All three publications were packaged in compliance with U.S. Postal Service regulations and contained warnings to advise the recipients about the contents inside. (Def. Exh. E).

Plaintiff does not recall when she received the first magazine mailing. (Pl.'s Dep. at 51). Plaintiff also does not recollect seeing any warnings with respect to the first mailing until after opening the package and putting it back together. (*Id.* at 51, 56). Plaintiff believed that the mailing was a Victoria's Secret catalogue. (*Id.* at 52). Subsequent to opening the packaging of the first magazine, plaintiff stated that she did not look at it very long and just flipped through it. (*Id.* at 52, 97). Plaintiff testified that she opened the second magazine mailing upon instruction from her attorney. (*Id.* at 56-57). Plaintiff's purpose for going through the second magazine was to look for a card to send back to the publisher requesting that no further magazines be sent. (*Id.* at 56-57). Plaintiff never opened the third magazine mailing, instead she delivered it to her attorney. (Pl.'s Dep. at 60). Plaintiff claims as a result of these mailings, two upsetting telephone conversations, and bills being sent to her, that ABC intentionally caused her to suffer severe emotional distress. (*Id.* at 88-89).

## II. SUMMARY JUDGMENT STANDARD

Under FED. R. CIV. P. 56(c), summary judgment is proper if the pleadings and evidence indicate that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment bears the initial burden of showing that no genuine issues exist. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and show that there is a genuine issue for trial. *See Celotex*, 477 U.S. at 324. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgement, the judge's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *See id.* at 255. Nevertheless, the nonmovant need not be given the benefit of every inference but only of every *reasonable* inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## III. DISCUSSION

### A.   Tort of Outrage

Alabama recognizes the tort of outrage when "one who by extreme or outrageous conduct intentionally or recklessly causes severe emotional distress to another." *Grimsley v. Guccione,*

703 F. Supp. 903, 907 (M.D. Ala. 1988) (quoting *American Road Service v. Inmon*, 394 So. 2d 361, 365 (Ala. 1980)). A plaintiff must prove four basic elements for a tort of outrage action to stand: (1) the defendant knew or should have known that its conduct was likely to result in emotional outrage; (2) the conduct was extreme and outrageous; (3) the defendant's actions were the cause of the plaintiff's distress; and (4) the emotional distress suffered by the plaintiff was "severe." *Id.*

The determination whether a statement or action is sufficiently extreme or outrageous to support a claim of outrageous conduct may be made by the trial court as a matter of law. *Logan v. Sears, Roebuck & Co.*, 466 So. 2d 121, 123 (Ala. 1985). A claim alleging outrage "is an action difficult of proof and one for which recovery may be had only upon meeting all the elements of the stringent standard announced in *American Road Service Co. v. Inmon*, 394 So. 2d 361 (Ala. 1980)." *State Farm Auto. Ins. Co. v. Morris*, 612 So. 2d 440, 442 (Ala. 1993) (quoting *Nabors v. St. Paul Ins. Co.*, 489 So. 2d 573, 574 (Ala. 1986)). "[M]ere insults, indignities, threats, annoyances, petty oppression, or other trivialities" do not give rise to the claim for tort of outrage. *Inmon*, 394 So. 2d at 364-65. "For conduct to be considered 'extreme' under Alabama law, it must be so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Grimsley*, 703 F. Supp. at 907 (quoting *Inmon*, 394 So. 2d at 365). In order for a plaintiff to recover for emotional distress, it must be "so severe that no reasonable person could be expected to endure it." *K.S. v. Carr*, 618 So. 2d 707, 713 (Ala. 1993).

Tort of outrage claims are available only in a limited number of factual settings. *Thomas v. BSE Indus. Contractors, Inc.*, 624 So. 2d 1041, 1044-45 (Ala. 1993). The *Thomas* court

stated that it had found a jury question on outrage claim in only three categories: 1) in the context of family burials; 2) a case where insurance agents employed heavy-handed, barbaric means in attempting to coerce the insured into settling an insurance claim; and 3) a case involving egregious sexual harassment. *Id* at 1044. Whenever a tort of outrage claim is asserted outside of these typical situations, it is appropriately subject to review for dismissal because it is wanting in the customary factual underpinnings necessary to maintain a claim for outrage under Alabama law.

Even if the acts of persons working at ABC rise to the stringent level of outrageousness necessary to maintain the claim against an individual, the Alabama Supreme Court has recognized that because the tort provides a remedy only in situations of extreme and outrageous conduct, the cause of action "should not be the basis for vicarious or respondeat superior liability except in the most compelling circumstances." *Busby v. Truswal Systems Corp.*, 551 So. 2d 322, 327 (Ala. 1989). Accordingly, because plaintiff seeks to impose vicarious liability on ABC for the alleged tortious conduct of unidentified persons working for ABC, plaintiff must satisfy this court that the circumstances surrounding her tort of outrage count are of the most compelling variety.

The difficulty in maintaining a tort of outrage claim under Alabama law is exemplified in *Handley v. Richards*, 518 So. 2d 682 (Ala. 1987) (per curiam). The administrator in *Handley* sued the defendant minister for outrageous conduct and clergyman malpractice resulting in the suicide of his son. *Id.* at 683. As alleged, the son and his wife were experiencing marital problems and sought counseling from their minister. *Id.* (J. Maddox, concurring specially). At the time of this counseling, the minister and the son's wife were deeply involved in a sexual affair, and she was attempting to obtain a divorce from her husband. *Id.* Ultimately, the son hung

himself. *Id.* The plaintiff claimed that "the emotional toll of this marital tribulation combined with the deceitful manner of the counseling by [the minister] caused [the son] to take his life." *Id.* In affirming the trial court's dismissal of the plaintiff's complaint on a Rule 12(b)(6) basis, the Supreme Court of Alabama agreed that the allegations failed to state a cognizable claim under Alabama law for either outrage or clergyman malpractice. *Handley,* 518 So.2d at 683.

Plaintiff's bases for claiming outrage are significantly less compelling than those relied upon by the plaintiff in *Handley*. Plaintiff contends that ABC's billing practices and the sending and receipt of sexually explicit material in the mail amount to the tort of outrage under Alabama law. However, such actions, even if taken to be true, are not so severe that a reasonable person could not be expected to endure the conduct. Even if plaintiff subjectively experienced difficulty with the purported actions of ABC, this alone is insufficient to maintain a claim for outrage, as the reasonableness standard employed is objective. *See Kizziah v. Golden Rule Ins. Co.*, 536 So. 2d 943, 948 (Ala. 1988). Only when reasonable people differ as to the severity and extremeness of the purported tortious conduct attributable to a defendant is the claim suitable for submission to a jury. *See id.* at 948-49.

Moreover, with respect to collection activities, the Supreme Court of Alabama has held that while it does not condone oppressive collection practices, such do not rise to the level of extreme behavior necessary to maintain a tort of outrage claim. *See Green Tree Acceptance, Inc. v. Standridge*, 565 So. 2d 38, 45 (Ala. 1990). As for the adult oriented magazines, plaintiff lacks sufficient evidence that ABC published or distributed these materials, much less that ABC intended for plaintiff to receive them and experience emotional distress. Even if plaintiff could

8

establish that ABC was responsible for the adult oriented magazines, the sending and receipt of such items do not establish outrage under Alabama law.

Furthermore, in terms of causation, prior to any involvement with ABC and as early as July of 1991, plaintiff began using Prozac for her mental depression. (Def. Exh. F and G). Plaintiff testified during her deposition that Dr. Virgil McGrady prescribed Prozac to her about the time she and her husband first started to have problems. (Pl.'s Dep. at 68-69). Plaintiff also stated that with respect to her visits to Dr. Shealy, she talked about her former husband, her personal life, and a lot of things. (*Id.* at 70-71). Plaintiff further indicated that her personal life may be related to the emotional problems that she claims to have experienced as a result of this case. (*Id.* at 70.).

Plaintiff has failed to point to any specific evidence that creates a material factual dispute as to her outrage claim. Plaintiff lacks sufficient evidence to establish the elements necessary to maintain a tort of outrage claim, especially in the context of trying to impose vicarious liability on ABC for the purported acts of its agents. Accordingly, plaintiff's outrage claim is due to be dismissed as a matter of law.

**B.     FDCPA**

The FDCPA defines "debt collector" as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6). ABC is not a "debt collector" within the meaning of the FDCPA. In a well-reasoned opinion that examined the Act's coverage in detail, the United States District Court for the Middle District of Alabama concluded that the

Act's coverage is limited to entities whose principal purpose is debt collection and that regularly collect debts for another. *Kimber v. Federal Financial Corp.*, 668 F. Supp. 1480, 1484 (M.D. Ala. 1987). The court specifically rejected the application of the Act to entities that do not meet both of these requirements:

> On the one hand it could be argued, as indeed Kimber does, that a 'debt collector' is defined in § 1692a(6) with alternative phrasing, as a business that either has as its principal purpose debt collection or that regularly collects debts for another. Since it is undisputed that FFC's principal purpose is debt collection, Kimber asserts that the corporation clearly falls under the first prong of the definition, regardless of whether the collection is undertaken for the corporation itself or for another. But, on the other hand, this Court is unaware of, and Kimber has not offered, any rationale for parsing the definition into two disjunctive parts; Kimber has not offered any logical explanation for why Congress would intend to cover 'any debts' by a business whose 'principal purpose' is debt collecting, but only 'debts owed or due another' where the business 'regularly' collects debts.

*Id.*

In order to qualify as a debt collector, an entity must engage in the collection of delinquent accounts or accounts that are in default. *See Holmes v. Telecredit Service Corp.*, 736 F. Supp. 1289, 1291 (D. Del. 1990) (stating "to the extent the mortgage servicing company receives delinquent accounts for collection it is a debt collector with respect to those accounts").

Based upon the reasoning set forth in the *Kimber* and *Holmes* decisions, ABC is not within the Act's general definition of "debt collector." ABC principally deals in the business of billing. (McGillewie Aff. ¶ 4). Any debt collection activities that it provides are incidental to the primary business purpose of ABC. (*Id.* ¶ 6). ABC's principal purpose is to invoice accounts only for ACI d/b/a IAS. (*Id.* ¶ 4). This process involves accounts that are neither delinquent nor in default. (*Id.* ¶¶ 6-7). ABC does, on occasion, attempt to collect on accounts that are past due. (*Id.* ¶ 6). However, ABC uses third party debt collection agencies in an effort to satisfy seriously

10

delinquent accounts or accounts that are in default for a significant number of days. (*Id.* ¶ 7). Because its principal purpose is not the collection on past due accounts and it does not perform this function on a regular basis, ABC is not within the general definition of "debt collector" under the Act.

Even if this court were to find that ABC is a "debt collector" within the meaning of the FDCPA, ABC is specifically excluded from the Act's coverage by 15 U.S.C. § 1692a(6)(B). The FDCPA specifically excludes from its coverage:

> [A]ny person while acting as a debt collector for another person, both of whom are related by common ownership or affiliated by corporate control, if the person acting as a debt collector does so only for persons to whom it is so related or affiliated and if the principal business of such person is not the collection of debts[.]

15 U.S.C. § 1692a(6)(B). The United States District Court for the Southern District of Georgia, in examining this exclusion, found support for its application in the fact "that the Act is directed at independent debt collectors." *Meads v. Citicorp Credit Services, Inc.*, 686 F. Supp. 330, 333 (S.D. Ga. 1988) (citing *United States v. Central Adjustment Bureau, Inc.*, 823 F.2d 880 (5th Cir. 1987) and *Kimber v. Federal Financial Corp.*, 668 F. Supp. 1480 (M.D. Ala. 1987)). In her opposition, plaintiff argues that ABC's failure to make a written disclosure about its affiliate relationship with ACI renders it unable to qualify for the § 1692a(6)(B) exclusion.

In *Meads*, the court held that Citicorp Credit Services, Inc. ("CCSI"), in collecting debts for a corporate affiliate, met the requirements of the § 1692a(6)(B) exclusion. *Meads*, 686 F.Supp at 334. In so holding, the court emphasized three factors:

>    (1) CCSI is collecting debts for a creditor with whom it is related by corporate control under the Citicorp umbrella;
>
>    (2) CCSI's principal function is solicitation and marketing of credit accounts, not collections; and
>
>    (3) CCSI services only Citicorp affiliates.

*Id.* The *Meads* court specifically rejected the argument that CCSI should be subject to the Act because it used its name, rather than the Citicorp name, in collecting debts:

> Meads' argument that the "name change" (CCSI collecting for Citibank) automatically triggers the Act under ¶ (6), ignores the ¶ (6)(B) exclusion altogether. As *Kimber* points out, the Act is not a model of "drafting clarity," 668 F. Supp. at 1484; however, the Court cannot accept Meads' interpretation of the Act which renders the specific (6)(B) exclusion meaningless. The exclusion permits an entity who is *not* the actual creditor to collect the creditor's debts if it meets the exclusion's requirements. It follows that the new entity must have a name different from the original creditor. Under Meads' interpretation, whenever the 6(B) exclusion becomes operative, the original creditor automatically becomes liable under the Act. This result cannot be intended. Moreover, the result does not follow from a literal interpretation of the statute's language. The creditor is not collecting the debt under an assumed name; rather, a separate and excludable entity is collecting the debt.

*Id; see also Phillips v. Periodical Publishers' Service Bureau, Inc.*, 388 S.E. 2d 787 (S.C. 1989).

As recognized by the United States Court of Appeals for the Fifth Circuit in *United States v. Central Adjustment Bureau, Inc.*, 823 F.2d 880, 880-81 (5th Cir. 1987), the FDCPA is not unconstitutional by limiting its coverage to independent debt collectors:

> Because the purpose of the Act is to prevent abusive debt-collection practices and Congress identified independent debt collectors as the 'prime source of egregious collection practices,' there is clearly a rational relationship between the Act's distinction among debt collectors and the underlying state interest.

*See* S. Report No. 95-382, 95th Cong., 1st Sess., *reprinted in* 1977 U.S.C.C.A.N. 1695, 1696.

As explained in *Kimber*, the congressional history of the FDCPA reveals "that the target and emphasis of the Act are 'third-party' or 'independent' collectors of 'past-due' or 'delinquent' debts." *Kimber, 668* F. Supp. at 1485. More specifically, as the Senate Committee reviewing the FDCPA stated:

> The committee intends the term "debt collector," subject to the exclusions discussed below, to cover all third persons who regularly collect debs for others. The primary persons intended to be covered are independent debt collectors.

*Id.* (quoting S. Report No. 95-382, 95th Cong., 1st Sess., *reprinted in* 1977 U.S.C.C.A.N. 1695, 1697).

The Senate Committee further observed:

> One subsidiary or affiliate which collects debts for another subsidiary or affiliate is not a "debt collector" so long as the collecting affiliate collects only for other related entities and its principal business is not debt collection.

S. Report No. 95-382, 95th Cong., 1st Sess., *reprinted in* 1977 U.S.C.C.A.N. 1695, 1698. The Senate Report gives no indication that a written disclosure of an affiliate relationship is necessary in order to qualify for the exclusion

In support of her position that a written disclosure of an affiliate relationship is necessary to take advantage of the § 1692a(6)(B) exclusion, plaintiff relies upon *Cramer v. First of America Bank Corp.*, 1993 LEXIS 16276 (N.D. Ill. November 16, 1993). In *Cramer*, a subsidiary and the bank it held changed names due to an acquisition. Both were found to be within the scrutiny of the Act because of this change in name. The *Cramer* decision cited by plaintiff is in conflict with the reasoning set forth in *Meads v. Citicorp Credit Services, Inc.*, 686 F. Supp. 330 (S.D. Ga. 1988). In addressing the affiliate exclusion, the *Meads* court disagreed that a name change automatically rendered the true creditor liable under the FDCPA. The *Cramer* opinion essentially

13

renders meaningless the affiliate exclusion under the FDCPA and is contrary to the plain language of the statute which provides:

> Notwithstanding the exclusion provided by clause (F) of the last sentence of this paragraph, the term [debt collector] includes any creditor who, in the process of collecting his own debts, uses any name other than his own which would indicate that a third person is collecting or attempting to collect such debts.

15 U.S.C. § 1692a(6). In this particular case, there is no evidence that plaintiff was somehow misled into believing that the subject bills had been handed over to a third party debt collector. Plaintiff only received invoices from ABC. She never received any so-called dunning letters from ABC such as the plaintiff in *Cramer* experienced.[4] The mere billing of accounts is not a collection activity, and accordingly does not even trigger the arguable requirement that an affiliate relationship be disclosed.

Plaintiff also relies upon *Pressman v. Southeastern Financial Group, Inc.*, 1995 WL 710480 (E.D. Pa. November 29, 1995). The *Pressman* decision is an extension of credit case in which the debt collector, Southeastern, tried to argue that because it was a creditor collecting its own debt in its own name, it was not subject to the Act. *Pressman*, 1995 U.S. Dist. LEXIS 17961 at *3. In fact, the evidence produced during discovery in *Pressman* demonstrated that another entity, Haven Scott, actually extended credit and that the purpose for setting up Southeastern was to collect payments from clients on a periodic basis when the clients were not

---

[4] As explained in the Senate Report, dunning letters are an essential part of a common collection abuse called "flat rating." A "flat-rater" sells a set of dunning letters to a creditor demanding the debtor to pay the creditor at once. The dunning letters bear the letterhead of the flat-rater's collection agency, even though the creditor is the actual entity sending the correspondence to the debtor and the flat-rater is not in the business of collection. Such letters give the debtor the impression that debt has been handed over to a third party debt collector. In reality, the collection of the debt is being handled in house. S. Report No. 95-382, 95th Cong., 1st Sess., *reprinted in* 1977 U.S.C.C.A.N. 1695, 1699.

14

able to pay Haven Scott in full. *Id.* As noted by the *Pressman* court, the statutory language of 15 U.S.C. 1692(a)(6) means, "[i]f a creditor uses an alias, then the creditor falls within the definition of 'debt collector.'" *Pressman*, 1995 U.S. Dist. WL 710480 at *3. No such evidence exists in this case.

As demonstrated by the Billing and Collection Agreement entered into between ABC and ACI, ABC is responsible for "initial bill rendering, mailing, accounting for payments, aging accounts, outbound and inbound telephone collections, mailing, negotiations, compromising of debts, and all other services usually incidental to a full service billing and collection company." (*See* Pl.'s Br. Opp'n to Def. Mot. Summ. J. Exh 3 ¶ 3). This list describes all the responsibilities of ABC regardless of the amount of time devoted to each specific category. Even so, this list demonstrates that collection work is but only one of ABC's obligations under the Billing and Collection Agreement.

ABC, like CCSI in the *Meads* case, is collecting debts for a corporate affiliate. (Shapiro Aff. ¶¶ 5-8). ABC provides incidental collection services to its client affiliate, ACI d/b/a IAS. (McGillewie Aff. ¶ 6). Similar to CCSI, ABC's principal function is not debt collection. *Id.* ABC, comparable to CCSI, serves only corporate affiliates. (Shapiro Aff. ¶¶ 5, 8). In fact, ABC provides billing and incidental collection services exclusively to ACI d/b/a IAS. (McGillewie Aff. ¶ 4). Therefore, ABC is exactly the sort of entity Congress intended to exclude in the 15 U.S.C. §1692a(6)(B) exception.

Even if the court did not find that ABC is excluded from the FDCPA by the specific language of 15 U.S.C. § 1692a(6)(B), ABC is specifically exempted from the FDCPA by the language of 15 U.S.C. § 1692a(6)(F). The United States Court of Appeals for the Fifth Circuit has held that an entity that takes an assignment of a debt that is not in default at the time of assignment is not subject to the FDCPA. *See Perry v. Stewart Title Co.*, 756 F.2d 1197, 1208 (5th Cir. 1985). In so holding, the court examined the language of the exception in 15 U.S.C. § 1692a(6)(F). This exception states in part that the term "debt collector" does not include:

> [A]ny person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity . . . (iii) concerns a debt which was not in default at the time it was obtained by such person.

15 U.S.C. § 1692a(6)(F); *Perry*, 756 F.2d at 1208. In *Perry*, the Fifth Circuit upheld the trial court's grant of the Federal National Mortgage Association's ("FNMA") motion for directed verdict on a plaintiff's claim under the FDCPA. *Perry*, 756 F.2d at 1208. In so holding, the court reasoned that FNMA took an assignment of mortgage debt approximately two months before the plaintiffs were in default. *Id.* Therefore, FNMA was exempt from the provisions of the FDCPA by the specific provisions of 15 U.S.C. § 1692a(6)(F)(iii) (formerly 15 U.S.C. § 1692a(6)(G)(iii)). *Id.*

Although ABC does not take an assignment of ACI's accounts, it obtains all accounts prior to any default and falls within the scope of 15 U.S.C. § 1692a(6)(F). ABC handles all of ACI's billing. Accordingly, when the initial invoices are sent out, none of the accounts are past due. ABC never takes an account from ACI after it has become delinquent. (McGillewie Aff. ¶¶ 6-7). Therefore, as a matter of law, ABC is excluded from coverage under the FDCPA by operation of 15 U.S.C. § 1692a(6)(F).

C.  **Civil Conspiracy**

In Count III of her Complaint, plaintiff maintains that ABC conspired with ACI to cause her injuries. In her opposition, plaintiff focuses her attention on the conspiracy to commit violations of the FDCPA. During her deposition, plaintiff conceded that at the time that she filed her lawsuit, she had no knowledge that ACI existed. (Pl.'s Dep. at 72-73). Plaintiff stated that she was relying advice that her attorney gave her in filing her suit against ACI. (*Id.* at 75).

A civil conspiracy is a combination of two or more persons to accomplish an unlawful end, by civil law standards, or to accomplish a lawful end by unlawful means. The elements are:

> the combination of two or more persons to do (a) something that is unlawful, oppressive, or immoral; or (b) something that is not unlawful, oppressive, or immoral, by unlawful, oppressive, or immoral means; or (c) something that is unlawful, oppressive, or immoral, by unlawful, oppressive, or immoral means.

See *Lawler Mobile Homes, Inc. v. Tarver*, 492 So.2d 297, 306 (Ala. 1986) (citations omitted).

ABC is entitled to summary judgment on plaintiff's conspiracy count due to her inability to maintain any substantive claims against ABC. Under Alabama law, conspiracy is not an independent cause of action. *Drill Parts & Service Co. v. Joy Mfg. Co.*, 619 So. 2d 1280, 1290 (Ala. 1993). Consequently, when alleging conspiracy, a plaintiff must have a viable underlying cause of action against the defendant to support the conspiracy claim. *Id.* In the absence of a viable underlying claim, summary judgment on any conspiracy count is proper. *Id.* Because plaintiff's tort of outrage claim and FDCPA claim are due to be dismissed on summary judgment, she has no viable action for civil conspiracy and it too is due to be dismissed on summary judgment.

## CONCLUSION

Based upon the foregoing, the court concludes that defendant's Motion for Summary Judgment is due to be granted. An Order consistent with this Opinion will be entered contemporaneously herewith.

**DONE** this 30th day of September, 1999.

*Sharon Lovelace Blackburn*
**SHARON LOVELACE BLACKBURN**
United States District Judge